UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Adam Nagle


      v.                                    Civil No. 08-cv-413-JL

Richard M. Gerry,
Warden, New Hampshire
State Prison, et al.


Adam Nagle


      v.                                    Civil No. 08-cv-432-SM

Richard M. Gerry,
Warden, New Hampshire
State Prison, et al.

Adam Nagle


      v.                                    Civil No. 08-cv-445-JL

Richard M. Gerry,
Warden, New Hampshire
State Prison, et al.


**REPORT AND RECOMMENDATION**

    Pro se plaintiff Adam Nagle is an inmate at the New

Hampshire State Prison ("NHSP"), who brought these 42 U.S.C. §

1983 actions to complain about his treatment while incarcerated.

Although plaintiff commenced three separate actions, the facts

underlying the claims in each complaint are the same; only the named defendants differs.[1]  Plaintiff contends defendants have failed to properly care for his seizure disorder, in violation of his Eighth Amendment right to be free from cruel and unusual punishment, and have retaliated against him for complaining about the care received, in violation of his First and Fourteenth Amendment rights to pursue the prison grievance process and to access the courts.  Plaintiff also asserts related state tort law claims and seeks preliminary injunctive relief.  After a two day evidentiary hearing on his request for a preliminary injunction, and careful consideration of the facts and arguments presented by both sides, I find that plaintiff is not likely to succeed on the merits of his claims and is not suffering, nor is he likely to suffer, irreparable harm.  I recommend, therefore, that the injunctive relief sought be denied.

---

[1]In civil action no. 08-413, plaintiff names as a defendant NHSP Sergeant Robert Parent; in civil action no. 08-432, he names NHSP Correctional Officer ("CO") Erik Jorgensen and four unnamed CO defendants; and in civil action no. 08-445, plaintiff names NHSP Warden Richard Gerry, Lieutenant Michael Schofield and Sergeant Christopher Pelletier as defendants.  Because all three complaints involve the same challenged conduct and assert overlapping allegations against the same defendants (in fact the same complaint was simply copied and used to commence two of the three actions), and because plaintiff seeks to consolidate the cases, the three actions were treated as one suit for purposes of the factual findings at the preliminary injunction hearing.

<u>Discussion</u>

<u>1.  Background</u>

Plaintiff came to the NHSP after violating parole in April 2008.  The evidence showed that plaintiff has a history of panic attacks and an anxiety disorder, which can cause him to behave like he is having a seizure.  These episodes, however, have been described as "seizure like" or "pseudo seizures," because the electrical activity in the brain typically associated with a seizure has not been recorded or otherwise detected in plaintiff. Whatever the medical basis for his behavior may be, plaintiff suffers from seizure-like activity that he apparently cannot control.  Plaintiff was aware of his seizure disorder when he arrived at the NHSP and informed staff of this problem.  In response, staff directed any cell mate of plaintiff to alert them if plaintiff began to have a seizure, by waving a white towel or sheet through the cell bars to flag for help.

The incident giving rise to the instant action occurred on June 14, 2008.  On that day plaintiff was housed in the Secured Housing Unit ("SHU") of the NHSP, awaiting placement in another part of the prison.  He began to have a seizure, and his cell mate flagged the prison guards.  Within minutes COs arrived at

plaintiff's cell, where they found him on the floor, apparently having a seizure.  Defendant Parent was one of the first guards to arrive on the scene, with two more guards, including defendant Jorgensen, following closely.  The call to plaintiff's cell was for a medical emergency, so NHSP nurse Frances Lufkin also arrived on the scene a few minutes later.

When Sergeant Parent arrived, he ordered plaintiff's cell mate cuffed outside the cell and quickly knelt down on the floor, placing plaintiff's head in his lap.  Within minutes plaintiff calmed down and regained enough consciousness to get up on the bunk.  Testimony at the hearing varied about the positions of plaintiff and defendants in the cell, but consistently showed that plaintiff sat up on his bed and then moved to the edge of the bunk, with his feet on the floor, next to Sergeant Parent, who held plaintiff's wrists in an effort to subdue him.

While plaintiff was sitting on the bunk, Nurse Lufkin began asking him questions to evaluate his condition, because his behavior was like nothing she had ever seen before and did not present like a normal seizure.  Although plaintiff was able to answer her questions correctly, and even asked for Valium, he

seemed to drift in and out of lucidity.[2]  He suddenly ripped his arms loose from Sergeant Parent's control and began flailing them in a violent, combative manner.  At that point, Sergeant Parent ordered Nurse Lufkin out of the cell as another CO, Randy Inman, stepped in to block plaintiff from Nurse Lufkin and help control the situation.  Plaintiff lashed out, striking CO Inman in the abdomen.  CO Inman immediately ordered plaintiff "taken down," and defendants Parent and Jorgenson, along with CO Inman, pinned plaintiff to the floor in an effort to control him.  As many as three or four other COs were in and out of the cell, trying to assist with the situation.

The evidence was unclear whether plaintiff was placed on a mattress or a blanket once brought to the floor, but was consistent that every effort was made to prevent plaintiff from banging his head or otherwise hurting himself.  Force was used to hold plaintiff down, and a blanket or pillows were placed around his head.  After several minutes, the episode ended, and

---

[2]Nurse Lufkin believed plaintiff was not having seizure, but instead knew what he was doing, both because of his behavior that day and because he identified her a days later as the nurse who assisted him that day.  Despite her suspicion of plaintiff's motives, she decided to give him the requested Valium because his records did not indicate he was drug-seeking and because he was so upset.

plaintiff lay down on his bunk.  Nurse Lufkin gave him the requested Valium, and he eventually fell asleep.  Plaintiff sustained a large hematoma on his forehead from the incident and received medical care for it again on June 17.  The evidence demonstrated that he did not complain of any other pain and sought no further medical attention.  The records also showed that plaintiff never complained to any mental health care staff members about how the seizure was handled.[3]

A second seizure incident occurred on August 25, 2008. Plaintiff was found at the bottom of some stairs, but could not recall whether he fell down the stairs or fell once at the bottom of them.  Plaintiff hit his head and complained of pain on his right side, headache and blurred vision, but he suffered no dizziness, nausea or double vision.  There was little testimony regarding this incident, but plaintiff had stopped taking his anti-seizure medication two weeks prior to the episode because he

---

[3]Testimony at the hearing showed that, after the June 14 episode, plaintiff did not think he had been mistreated.  During a phone call with his mother on June 19, plaintiff told her he had been hurt by the officers only because he had been out of control, and that he had not gotten into any trouble despite his violence, because the officers understood he could not control his behavior.  Plaintiff testified that he was referring to several different seizures, not just the June 14 seizure, when he was speaking to his mother.

believed it provoked nightmares.  It was unclear how long he had been lying there before help came; however, the medical records show he was seen by Dr. Eppilito at the NHSP and was taken to Concord Hospital for a neurological evaluation and treatment. There was no evidence that plaintiff sustained any serious or permanent injuries from the fall or otherwise received inadequate medical care for this incident.

Plaintiff testified that he suffers from seizures regularly, but that he stopped complaining about them because of how poorly he was treated by NHSP staff when having one.  This testimony was contradicted by both the consistent testimony of many NHSP COs, as well as Nurse Lufkin, who praised how carefully plaintiff had been handled.  The evidence showed that defendants understood plaintiff has a medical problem, and that his violence and combativeness were beyond his control.  He has received no disciplinary reports for his behavior during any seizure.  The medical records introduced at the hearing also contradicted plaintiff's claim, which document the care plaintiff continued to receive throughout 2008 and early 2009, specifically for his seizure episodes and anxiety.  Plaintiff's medical file reflects many visits to the medical staff, adjustments to his medication,

and discussions with plaintiff about his problems and how best to deal with them.

The evidence also demonstrated the precautionary measures defendants have taken to care for plaintiff.  NHSP staff ordered a mattress be placed on the floor in plaintiff's cell, to provide him with a safe place to lie while having a seizure episode. Another NHSP nurse, Pat Keon, testified that he understood plaintiff was particularly tactile sensitive, which causes him to lash out if touched when having a seizure.  Nurse Keon testified that he has advised staff to leave plaintiff alone on the floor until the episode ends.  Nurse Lufkin corroborated that testimony, explaining it was standard policy to leave a person alone until the seizure ended.[4]  The evidence readily demonstrated that plaintiff has been handled consistent with this standard procedure.  Finally, as recently as December 2008, plaintiff was transferred to SHU, where he was placed in the only cell with a video camera specifically so defendants could monitor

---

[4]Although defendant Parent testified he did not know about plaintiff's tactile sensitivity, the medical records and other testimony indicated that NHSP staff understood the safest way to handle anyone having a seizure, including plaintiff, was to get them prostrate on the ground and leave them alone until the activity ended.

him and respond quickly if an episode began.[5]

Plaintiff testified that when he was moved to the NHSP's Close Custody Unit ("CCU") in October 2008, the mistreatment during his seizures finally stopped.  Plaintiff further testified, however, that at that time he began to be harassed by defendants for having filed complaints about the care he had received for his seizures.  The evidence surrounding the alleged harassment was confusing and inconsistent.  Although plaintiff originally asserted his retaliation claim against several defendants, at the hearing plaintiff stated that he was only pursuing the claim against Sergeant Parent, and that he agreed to dismiss the claim against all other defendants.[6]

Testimony at the hearing indicated that plaintiff first complained about the June 14 episode in September 2008, when he wrote a confidential letter to the warden.  Plaintiff believed that his confidential mail to the warden was being intercepted by

---

[5]Plaintiff asked to be transferred from the cell and his request was granted.

[6]Based on my review of the record, it appears that plaintiff may have intended to state that the retaliation claim was limited to Sergeant Pelletier, not Sergeant Parent.  If plaintiff in fact erroneously named the defendant against whom he intends to pursue this claim, the mistake is wholly irrelevant, because the record fails to demonstrate that plaintiff was retaliated against by anyone at the NHSP.

NHSP employees and complained about that to Sergeant Pelletier, asking him to begin an investigation into plaintiff's claims and asking him to copy all incident reports pertaining to him. Sergeant Pelletier advised plaintiff to fill out an Inmate Request Slip ("IRS") to grieve his complaint, which would then be handled pursuant to the standard NHSP grievance procedure. On October 3, 2008, plaintiff filed an IRS form and attached a fourteen page narrative detailing his complaints of abuse and neglect and recommending changes to improve the handling of his seizures. See Pl.'s Ex. 1.

Among his complaints, both in the IRS and at the hearing, was that Sergeant Pelletier refused to investigate, correct or punish any NHSP CO, even if he witnessed some malfeasance. The evidence, though, did not support this claim. Sergeant Pelletier explained that he enforces the rules of the prison against everyone, staff and inmates alike, and would only refuse to investigate an officer if he were from another unit and, therefore, not under Pelletier's authority. Sergeant Pelletier further testified that he explained to plaintiff that complaints against officers outside his purview needed to be reported to the appropriate commanding officer and formalized by filing an IRS

form.  Sergeant Pelletier denied ever telling plaintiff he would
not punish COs who violated prison rules.

In fact, Sergeant Pelletier gave plaintiff a disciplinary
report for making that false statement in the October 3 IRS form.
<u>See</u> Def.'s Ex. E-2.  At the hearing on that disciplinary report,
plaintiff was found guilty of having lied about Sergeant
Pelletier in the October 3 IRS.  Plaintiff then claimed that this
disciplinary report further evinced the retaliatory treatment he
was enduring.  On October 22, 2008, plaintiff filed another IRS
form, complaining that an officer's word was accepted over his
word, simply because of their relative positions at the prison.
<u>See</u> Pl.'s Ex. 3.  In plaintiff's view:

> That officer only had to deny my accusation
> and write me a d-report.  That is retaliation
> plain and simple.  Now your officer again did
> the same thing and if I report his actions he
> need only deny it and write another d-report.
> Regardless of how you feel about me personally
> you know I have a constitutional right to admin-
> istrative redress without retaliation by your
> office.  I am asking that you rectify this issue
> in some way please.

<u>Id.</u>  This claim was undermined by the guilty finding of the
hearing officer.  It was further undermined by Sergeant
Pelletier's credible testimony, which explained how he enforces
NHSP rules and regulations and clarified in detail how he had

handled plaintiff's grievances.

Plaintiff introduced three more exhibits in support of his retaliation claim.  First, on September 27, 2008, he requested a copy of Sergeant Parent's incident report for the June 14 seizure.  See Pl.'s Ex. 5.  Sergeant Parent replied that he had only one copy and was not sure if he could provide it to plaintiff at that time.  See id.  Plaintiff also proffered his October 23, 2008 IRS form complaining that Lieutenant Schofield was "losing" his mail and not properly responding to his complaints.  See Pl.'s Ex. 4.  This IRS form was answered by Lieutenant Schofield, who denied the allegations and explained the efforts he was making to assist plaintiff in processing his grievances.  The form was also reviewed by Unit Manager Thyng, who explained to plaintiff that Lieutenant Schofield had given plaintiff the opportunity to combine all the complaints he had grieved in the "lost" IRS forms and resubmit them for processing.

Plaintiff apparently accepted that offer, because he gave Lieutenant Schofield many IRS forms on November 4, 2008.  See Pl.'s Ex. 2.  One of the IRS forms plaintiff gave Lieutenant Schofield on November 4 accused Sergeant Pelletier of ripping his pictures off the wall.  Lieutenant Schofield wrote a disciplinary

report on plaintiff for lying about an officer; however,
following a hearing on the incident, plaintiff was found not
guilty of the charged infraction.[7]

Finally, the testimony at the hearing was that plaintiff had
sent many confidential letters to the warden throughout the
summer and fall of 2008, and had received several replies.  The
evidence introduced at the hearing consistently demonstrated that
plaintiff has successfully used the prison grievance system,
despite his belief that his mail and IRS forms were being
intercepted to deter him from seeking redress for his alleged
injuries.  The evidence also showed that plaintiff has been
fairly treated by the grievance system, having been punished only
after being found guilty of the first disciplinary report and
having been found not guilty of the second disciplinary report.

Testimony at the hearing also discredited plaintiff's claim
that as recently as December 2008, CO Michael Byron threatened to
physically harm plaintiff for having pursued his complaints.
Although CO Byron yelled at plaintiff, the evidence showed
plaintiff instigated the run-in by not following orders and by

---

[7]Sergeant Pelletier explained at the hearing that during a
routine inspection of more than 800 cells in CCU, he ripped a
corner of one of plaintiff's pictures that plaintiff had refused
to take down, in violation of prison rules.

13

inciting the tier.  Plaintiff admitted that he had resolved the
conflict with CO Byron and, in fact, had never been harmed by
him.  One NHSP inmate testified that plaintiff admitted he was
pursuing the lawsuits not because he had been injured but because
he wanted to win a $400,000 verdict, which he would use to buy a
house with his girlfriend upon his release.  A second inmate
testified that plaintiff told him he was suing for a lot of money
and had offered to "take care of him" if he would write a
statement corroborating the alleged threat from CO Byron.  The
evidence proffered at the hearing consistently undermined and
discredited plaintiff's perception of his treatment at the NHSP.

      2.  Standard of Review

      As the moving party, plaintiff bears the burden of
demonstrating that an injunction is needed to prevent irreparable
harm and to preserve the status quo, to enable a meaningful
disposition of his claims.  See CMM Cable Rep. v. Ocean Coast
Props., 48 F.3d 618, 620-21 (1st Cir. 1995) (enjoining certain
conduct permits the court "more effectively to remedy discerned
wrongs").  Irreparable harm occurs when the challenged conduct
causes some harm that cannot be adequately redressed with
traditional legal or equitable remedies following a trial.  See

<u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 18 (1st Cir. 1996) (finding irreparable harm where legal remedies are inadequate); <u>Acierno v. New Castle County</u>, 40 F.3d 645, 653 (3d Cir. 1994) (explaining irreparable harm).  To carry this burden, plaintiff must demonstrate:  "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." <u>Esso Standard Oil Co. v. Monroig-Zayas</u>, 445 F.3d 13, 18 (1st Cir. 2006) (internal quote omitted); <u>see</u> <u>also</u> <u>Ross-Simons of Warwick, Inc.</u>, 102 F.3d at 18-19 (explaining the burden of proof for a preliminary injunction).

If plaintiff is not able to show a likelihood of success on the merits, the remaining factors "become matters of idle curiosity," <u>id.</u>, insufficient to carry the weight of this extraordinary relief on their own.  <u>See</u> <u>Esso Standard Oil Co.</u>, 445 F.3d at 18 (the "<u>sine</u> <u>qua</u> <u>non</u> . . . is likelihood of success on the merits") (internal quotation omitted)).  Although success on the merits is critical, a preliminary injunction will not

15

issue unless plaintiff will be irreparably harmed without the requested relief.  See Ross-Simons of Warwick, Inc., 102 F.3d at 19 ("the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem").  As explained below, I find the current record demonstrates that plaintiff is unlikely to succeed on the merits of his claims and will not suffer irreparable harm unless an injunction issues.

    3.  Eighth Amendment Claims

    Plaintiff claims that defendants have abused him, used excessive force on him, and denied him adequate medical care, in violation of his Eighth Amendment right to be free from cruel and unusual punishment.  See U.S. Const. amend. VIII.  He requested injunctive relief in the form of a transfer from the NHSP, and I assume he seeks it generally to stop the alleged abuse.

    An Eighth Amendment violation contains both an objective component, that the challenged conduct is sufficiently egregious that it offends evolving standards of decency and denies plaintiff "the minimal civilized measure of life's necessities," Rhodes v. Chapman, 452 U.S. 337, 347 (1981), and a subjective component, that prison officials acted with deliberate indifference to the plaintiff's serious needs, which results in

16

the "unnecessary and wanton infliction of pain." Ingraham v. Wright, 430 U.S. 651, 670 (1977) (quoting Estelle v. Gamble, 429 U.S. 97, 102–03 (1976)); see also Wilson v. Seiter, 501 U.S. 294, 298–99 (1991); Farmer v. Brennan, 511 U.S. 825, 832–34 (1994); Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002).  That protection has been construed to require that prison officials are not deliberately indifferent to an inmate's serious medical needs.  See Farmer, 511 U.S. at 831; Rhodes v. Chapman, 452 U.S. 337, 347 (1981); Surprenant v. Rivas, 424 F.3d 5, 18–19 (1st Cir. 2005); Barrett v. Coplan, 292 F. Supp. 2d 281, 285 (D.N.H. 2003). Deliberate indifference relates to the prison official's subjective awareness of the inmate's need and his intentional failure to ensure the needed treatment is provided.  Farmer, 511 U.S. at 837 (describing subjective component of the violation); Estelle, 429 U.S. at 105–06 (inflicting unnecessary and wanton pain violates the Eighth Amendment, not medical negligence); Barrett, 292 F. Supp. 2d at 285 (finding deliberate indifference "where the medical care provided is so clearly inadequate as to amount to a refusal to provide essential care" (internal quotation omitted)).

Plaintiff has failed to carry his burden here on either the

17

objective or the subjective component of his Eighth Amendment claim.  Nothing in the record supports his claim that he suffered from excessive force or abuse, either while he had a seizure or independent of those episodes.  Throughout the two days of testimony, plaintiff's claims were repeatedly undermined and contradicted by the many witnesses who testified, including two other inmates, two nurses and several COs.  The record was replete with evidence that the force used against plaintiff was in response to his own violent, combative behavior and was done in a good-faith effort to diffuse tension and prevent physical harm.

The two incidents where plaintiff was restrained -- during transport to the infirmary and during the June 14 seizure -- lasted only as long as plaintiff's medical condition seemed to require.  The several witnesses who described the events of June 14 were extremely credible, explaining the urgency of the situation and their intention to minimize any injury plaintiff might have inflicted either on himself or others.  The evidence was consistent and substantial that defendants understood plaintiff's violent behavior was caused by a medical condition and should be dealt with as a medical emergency, not a

disciplinary infraction.  The evidence also showed that a standard protocol was both in place and in fact implemented to deal with plaintiff's seizures, including having a mattress in his cell and leaving plaintiff alone until the episode ended.[8]

Nothing in the record remotely supports plaintiff's claim that defendants acted with callous and reckless disregard of his serious medical needs.  To the contrary, I find that plaintiff has received immediate and appropriate care as soon as defendants have realized he is having a seizure-like episode, as evidenced by both the testimony at the hearing and plaintiff's medical records.  Cf. Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991) (deliberate indifference found where "the attention received is so clearly inadequate as to amount to a refusal to provide essential care"); Burke v. N.D. Dep't of Corr., 294 F.3d 1043, 1044 (8th Cir. 2002) (citing gross incompetence and intentional maltreatment as examples of deliberate indifference); Rather than disregarding a substantial risk of serious harm or

---

[8]Sergeant Parent admitted at the hearing he did not understand previously that plaintiff was tactile sensitive and, therefore, should not be touched while having an episode.  Yet there was also no evidence that Sergeant Parent was involved in responding to any of plaintiff's seizures besides the June 14, 2008 incident.  The evidence surrounding the handling of the June 14 incident overwhelming demonstrated the chaos of an emergency and the compassion and care taken to respond to the situation.

unnecessarily and wantonly inflicting pain, see Estelle, 429 U.S.
at 106, Farmer, 511 U.S. at 847, the record here amply supports
the conclusion that defendants have been attentive to plaintiff's
condition and responsive to his needs for medical care.  Based on
the substantial evidence justifying the decisions made here, I
find plaintiff is unlikely to succeed on his Eighth Amendment
claims for either excessive force or denial of adequate medical
care.

        4.  Retaliation Claims

        Plaintiff's claim that defendants have retaliated against
him for complaining about how his seizures have been handled is
similarly baseless, as he has failed to adduce evidence to
support any part of a retaliation claim.  To demonstrate
retaliation, there must be "(1) constitutionally protected
conduct, (2) an adverse action by prison officials sufficient to
deter a similarly situated person of ordinary firmness from
exercising his [constitutional] rights, and (3) a causal link
between the exercise of his constitutional rights and the adverse
action taken against him."  Mitchell v. Horn, 318 F.3d 523, 530
(3d Cir. 2003) (internal quotation omitted)).  The chronology of
events is critical, because "a retaliatory state of mind

typically is not susceptible to proof by direct evidence that can be averred in a complaint." Ferranti v. Moran, 618 F.2d 888, 892 (1st Cir. 1980) (citing McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979)).  Retaliatory intent can be inferred, however, from the chronology of the cited events.  See id.; see also Oropallo v. Parrish, No. 93–1953, 1994 WL 168519, at *4 (1st Cir. May 5, 1994) (explaining how the challenged event must follow the exercise of the constitutional right).

The evidence here shows no suggestion of retaliatory treatment.  As described at length above, plaintiff suffered no adverse consequences for having pursued his complaints through the prison's grievance system to the instant lawsuits.  The record demonstrates that his IRS forms have been responded to, and that the disciplinary procedure has been properly followed. The testimony at the hearing overwhelmingly stated that plaintiff is argumentative, disobedient and violent, and those privileges he has lost were justified by his own conduct and not done in retaliation for his having exercised his right to seek redress for his grievances.  Testimony at the hearing also showed that plaintiff has violated several NHSP rules, including bartering and inciting the tier, and received no disciplinary action.

Finally, plaintiff admitted, consistently with the testimony of all the other witnesses, that despite his violent, combative behavior during his seizure-episodes, he has never been punished.

I find, based on the record before me, that plaintiff simply has not been adversely treated by defendants since his arrival at the NHSP.  There is nothing that even gives rise to an inference that defendants' treatment of plaintiff was motivated by a retaliatory intent to deter him from exercising his constitutional right to seek redress for his complaints.  The record points to the inevitable conclusion, that plaintiff is unlikely to succeed in his retaliation claim.

<u>Conclusion</u>

For the reasons set forth above, I find that plaintiff is unlikely to succeed in either his Eighth Amendment claims or his First and Fourteenth Amendment retaliation claims.  To the contrary, the evidence suggests that plaintiff's complaints may be less than genuine, and he is advised that representations to the court must be made in good-faith and supported by factual evidence.  <u>See</u> Fed. R. Civ. P. 11(b).

Because I find that plaintiff is unlikely to succeed on the merits of his claims, further analysis of the factors justifying

22

a preliminary injunction is not warranted.  I recommend that plaintiff's request for preliminary injunctive relief be denied.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13–14 (1st Cir. 1992); United States v. Valencia–Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge


Date:  February 17, 2008

cc:  Adam H. Nagle, pro se
     Deborah B. Weissbard, Esq.

23